## SUPREME COURT — SPECIAL TERM — KINGS COUNTY.

### September, 1919.

## THE PEOPLE v. ALESSANDRIO VOLLERO.

### (108 Misc. 636.)

NEW TRIAL—WHEN MOTION FOR, GRANTED—INDICTMENT—ACCOMPLICE—
NEWLY DISCOVERED EVIDENCE—CODE CRIM. PRO., § 465.

A separate trial of defendant, indicted with others for murder in the first degree, proceeded upon the theory that certain persons known as "The Navy Street Gang" conspired to kill six of "The Morellos," a gang of Italians, in order to obtain control of certain lines of graft and blackmail supposed to be levied upon "The Morellos," as well as to have revenge against said gang for the murder of a certain individual. While the evidence showed that defendant did not actually participate in the killing of any of three members of the Morello gang and was not present at the commission of the murder, the prosecution claimed that defendant plotted and planned one of them and that he was one of the acknowledged leaders of "The Navy Street Gang." The defendant having been convicted as charged in the indictment, his conviction was affirmed on appeal by a divided court, but without opinion. Daniello, the principal witness for the prosecution, was regarded for all purposes of the trial as an accomplice both in law and in fact. The prosecution contended both upon the trial, in the Court of Appeals, and upon this motion, that there was sufficient corroboration of the testimony of Daniello to sustain the charge of murder made against the defendant. Such corroboration was claimed to rest principally, although not wholly, on the testimony of the witness Mancini. At the time of the trial of this defendant Mancini was under indictment for the murder of Ferrazano, who was one of the six men whose death was the object of the conspiracy. This fact was not brought to the attention of the court or the jury by the prosecuting officer. The indictment against Mancini was what is known as a secret indictment, to which, after the trial and conviction of this defendant, Mancini pleaded guilty to manslaughter in the second degree, and upon the recommendation of the district attorney of Kings county received the same terms and benefit as Daniello had received, a suspended sentence and probation. Evidence reviewed and *held*, that Mancini was not only an accomplice in fact, if the testimony of Daniello is to be believed, but he was an accomplice in law, and his testimony was wholly ineffective in corroboration of the testimony

given by Daniello, and the court, in the exercise of its judicial discretion, will grant defendant's motion for a new trial under section 465 of the Code of Criminal Procedure on the ground of newly discovered evidence.

MOTION for a new trial in a criminal prosecution for murder in the first degree on the ground of newly discovered evidence.

*Edward J. Reilly*, for motion.

*Harry E. Lewis*, District Attorney (*Herbert N. Warbasse* and *Ralph E. Hemstreet* of counsel), in opposition.

BENEDICT J.:

The defendant Alessandrio Vollero was convicted by a jury in this court of the crime of murder in the first degree. Upon appeal the Court of Appeals affirmed the conviction by a divided court and without opinion under section 542 of the Code of Criminal Procedure, the section providing that the court must give judgment without regard to technical errors or defects or exceptions which do not affect the substantial rights of the parties. 226 N. Y. 587. The defendant has moved this court at Special Term for a new trial under section 465 of the Code of Criminal Procedure upon the ground of newly discovered evidence. Although the motion was heard on June 7th last, the brief of the district attorney was, with the court's concurrence, not submitted until July 5th, and the great length of the printed record, comprising more than 1,000 pages, and the importance of the questions involved in the motion, both to the defendant and to the public, have precluded an earlier determination. Whatever doubt this court may entertain as to the legality of the original conviction must remain unexpressed in deference to the judgment of the Court of Appeals that any technical errors or defects upon the trial as disclosed by the record did not affect the defendant's substantial rights. The only question which now requires solution is that raised by the

defendant's motion for a new trial upon the grounds which the statute expressly authorizes, as set forth in the section above referred to. That section, in subdivision 7, provides that the court has power to grant a new trial "Where it is made to appear, by affidavit, that upon another trial the defendant can produce evidence such as, if before received, would probably have changed the verdict; if such evidence has been discovered since the trial, is not cumulative; and the failure to produce it on the trial was not owing to want of diligence."

The court has approached the consideration of the question involved with full appreciation of the grave responsibility resting upon it and recognizing that its decision upon the question is final and unappealable after affirmance of the original judgment of conviction either by the defendant (see People v. Trezza, 128 N. Y. 529, 8 N. Y. Crim. 291; People v. Mayhew, 151 id. 607; Hebberd v. Loeb, 125 App. Div. 579) or by the People (People v. Beckwith, 42 Hun, 366, 5 N. Y. Crim. 222; People v. Priori, 163 N. Y. 99).

The defendant was indicted with eight other men for the killing of Charles Ubiraco. He demanded and obtained a separate trial. The theory upon which he was tried was that certain persons known as "The Navy Street Gang," in order to obtain control of certain lines of graft and blackmail which were supposed to be levied upon Italians from and by a gang known as "The Morellos," in Harlem, borough of Manhattan, as well as to have revenge against the Morellos for the murder of one Del Guardio, entered into a conspiracy to kill six men belonging to the Morello gang. Three of these six men were actually killed, viz.: Charles Ubriaco and Nicholas Morello on September 7, 1916, and Antonio Ferrazano on October 6, 1916. The three other members of the Morello gang, who it is claimed were to have been killed by the conspirators, escaped. The defendant himself did not actually participate in the killing of any of the three men who were killed, nor was he present at the commission of the murders; but the prosecution

claimed that he plotted and planned the murder of Ubriaco, and that he was one of the acknowledged leaders of "The Navy Street Gang." To quote from the very able and comprehensive brief of the district attorney submitted to the Court of Appeals: "The whole case of the prosecution was based upon the theory that a criminal conspiracy existed to kill these six men," and in order to prove the existence of such conspiracy the People introduced evidence showing at least thirty-six conferences which took place at different places and between different individuals beginning in August, 1916, three weeks before the murders, which took place on the seventh of September, and continuing at intervals down to some time in the winter after Ferrazano had been killed. The proof showed that the defendant and Raffele Daniello, hereinafter referred to, were present at almost all of these conferences, and that one Giovanni or John Mancini, hereafter referred to, was present at at least six conferences, of which three were before and three after the murders of September 7, 1916. The brief of the district attorney before the Court of Appeals contains this statement: "Raffele Daniello, whose complete confession brought about this prosecution, and who was the chief witness for the People, participated in and described on the witness stand a great many different conferences held by various members of the Navy Street Gang, at which the conspiracy to kill the Morellos and obtain possession of their various forms of graft was discussed, and plans were laid for the successful accomplishment of its ultimate purpose." Brief, p. 25. "The prosecution presented its case to the jury upon the theory of a conspiracy, of which the killing of Charles Ubriaco and Nicholas Morello was only a part. * * * The existence of the conspiracy was relied upon to justify the admission of a great deal of the proof that was accepted by the court." Id. p. 65. "The theory of the defense was that Daniello, to save himself, related to the jury a true story, into which he falsely wove the name of Vollero." Id. p. 67.

It is undeniable that without Daniello's testimony the defendant's conviction would have been impossible. There is no attempt to dispute the fact that it was his confession that caused the conviction. He is repeatedly referred to in the district attorney's brief as the "principal witness for the prosecution." He was regarded for all purposes of the trial as an accomplice both in law and in fact. The trial justice, in charging the jury, said: " There is no question about his being an accomplice, if you believe what he says, because he says he is, and that settles that point." Daniello, having turned state's evidence, later, with consent of the district attorney, took a plea and was released, at the request of the district attorney, under a suspended sentence. The rule as to who may be regarded as an accomplice is thus stated in People v. Sweeny (213 N. Y. 37, 46) : "To constitute an accomplice one must be so connected with a crime that at common law he might himself have been convicted either as a principal or as an accessory before the fact. (People v. Zucker, 20 App. Div. 363, 365, 14 N. Y. Crim. 464; affd., on opinion below, 154 N. Y. 770; People v. Bright, 203 N. Y. 73, 79.)" Assuming, therefore, that Daniello was an accomplice within the meaning of the statute next referred to, what was the effect of such complicity upon his evidence? Section 399 of the Code of Criminal Procedure reads as follows: " A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime."

The prosecution contended both upon the trial, in the Court of Appeals, and upon the present motion, that there was sufficient corroboration of the testimony of Daniello to sustain the charge of murder made against the defendant. Such corroboration was claimed to rest principally, although not wholly, on the testimony of John Mancini. The prosecution maintained that Mancini was not like Daniello, an accomplice, but that he was, so to speak, a mere witness or spectator, whose evidence

had the force of corroboration from an independent source or disinterested standpoint. At page 123 of the People's brief in the Court of Appeals this occurs: "There is not one word of evidence in the entire case from which Mancini could possibly be convicted as a principal of this crime, not one word of evidence that connects him directly or indirectly with its commission." His relation to the case is then compared with that of a maid working in a disorderly house with full knowledge of the character of the place, and who has been held not to be an accomplice as a matter of law.

I am wholly unable to subscribe to this proposition. Mancini, as will be seen, was indicted as a principal for the murder of Ferrazano, who was one of the six men whose death was the object of the conspiracy. If a conspiracy were entered into either for the purpose of effecting, or resulting in, the murder of six persons, and three of them were murdered by different members of the criminal conspiracy, all the conspirators are liable as principals for the commission of each murder. If it be true that a criminal conspiracy to commit these murders was formed and that Mancini aided or abetted in their commission, he was "concerned in the commission" of all the crimes, whether present or absent, when each crime was committed. He thereby became an accessory before the fact and liable as a "principal" even though he did not actually participate in any of the homicides. Penal Law, § 2.

Hence, if Mancini were an accomplice in those crimes, his testimony was insufficient to corroborate that of Daniello. What is to be deemed sufficient corroboration under our statute has repeatedly been defined by our courts. A brief notice of the principal authorities will not be out of place.

In People v. Hooghkerk (96 N. Y. 150, 162), Judge Andrews, after referring to this statute, said: "Prior to this statute the rule in the state permitted the jury to convict a defendant upon the uncorroborated testimony of an accomplice (People v. Costello, 1 Denio, 83), but it was the uniform

custom of judges to advise the jury that the evidence of the accomplice should be received with great caution, and it rarely happened that a conviction was had upon his unsupported evidence. The rule now embodied in the statute is substantially the rule which before the statute courts were in the habit of stating to the jury for their guidance, although, as has been said, it was not enforced as a rule of law.

"It is plain that independently of the statutory rule corroborative evidence to have any value must be evidence from an independent source of some material fact tending to show not only that the crime has been committed, but that the defendant was implicated in it, and such is the doctrine of the best considered cases. But neither the doctrine hitherto declared by the courts, nor the rule embodied in the statute, requires that the whole case should be proved outside of the testimony of the accomplice. Such a rule would render the testimony of an accomplice in most cases unnecessary, and would defeat the policy of the law which permits the use of accomplices as witnesses in aid of, and in the interests of public justice."

In People v. Plath (100 N. Y. 590, 4 N. Y. Crim. 53, rev'g 3 N. Y. Crim. 129), Chief Judge Ruger, in referring the rule as to corroboration before the statute, said: "Although such cases are not strictly analogous to those where corroboration is required by statute, they yet furnish some help in determining the degree of proof required in the latter case. The rule as to the corroboration of an accomplice is stated in Roscoe's Criminal Evidence, 122, as follows: 'That there should be some fact deposed to, independently altogether of the evidence of the accomplice, which, taken by itself, leads to the inference not only that a crime has been committed but that the prisoner is implicated in it.' Russell on Crimes, 962, says: 'That it is not sufficient to corroborate an accomplice as to the facts of the case generally, but that he must be corroborated as to some material fact or facts which go to prove that the prisoner was connected with the crime charged.' "

The latter case is referred to by Judge Peckham in People v. Ogle (104 N. Y. 511, 515, 6 N. Y. Crim. 165), where he says of the Plath case: " It only requires a corroboration as to some material fact which goes to prove the prisoner was connected with the crime." And he then points out " that the witnesses, in regard to whom the request was made, were not accomplices in any sense of the word." And that: " Even if the rule as to the evidence of an accomplice had been erroneously stated by the court, it was, therefore, wholly immaterial in this case."

In People v. Everhardt (104 N. Y. 591, 6 N. Y. Crim. 231), Judge Earl says, speaking of the section in question: " This section has changed that rule of law and requires that there should be simply corroborative evidence, which tends to connect the defendant with the commission of the crime. * * * Whether that evidence was sufficient corroboration of the accomplice was for the determination of the jury. The law is complied with if there is some other evidence fairly tending to connect the defendant with the commission of the crime, so that his conviction will not rest entirely upon the evidence of the accomplice." In People v. Elliott (106 N. Y. 288, 292), Judge Earl said: " It is not necessary that the corroborative evidence of itself should be sufficient to show the commission of the crime, or to connect the defendant with it. It is sufficient if it tends to connect the defendant with the commission of the crime. Nor need the corroborative evidence be wholly inconsistent with the theory of the defendant's innocence. The court, before it should submit the case to the jury, should be satisfied that there is some corroborative evidence fairly tending to connect the defendant with the commission of the crime, and when there is, then it is for the jury to determine whether the corroboration is sufficient to satisfy them of the defendant's guilt." To the same effect is the case of People v. Mayhew (150 N. Y. 346).

In People v. Christian (78 Hun, 28; affd., 143 N. Y. 666,

on opinion below), it was held that: "Under this statute it matters not how consistent the narration of the accomplice, how much it is fortified by detail in the·statement itself, or how. reasonable and convincing the relation of facts by her, it is not enough unless corroborated by such other testimony as tends to connect. the defendant with the commission of the crime."

In People v. Patrick (182 N. Y. 131, 19 N. Y. Crim. 36), Judge Gray, writing the prevailing opinion, quotes from the Mayhew case and says of the rule there stated: " This is but just; or, otherwise, if the statute is to be given a narrower construction, the ends of justice might be often defeated.    The law, in its humane policy, intends that the life, or the liberty, . of an accused person shall not be sworn away by an accomplice, unless the accomplice be so corroborated, as to some material fact, or facts, as that a belief in his credibility becomes reasonable and, therefore, safe to be entertained."

This rule of corroboration extends also to the proceedings before the grand jury which found the indictment.

In People v. Sweeney (213 N. Y. 37, 42, 32 N. Y. Crim. 232), Judge Chase, after referring to the section under consideration, says in reference to the Code of Criminal Procedure: " It also provides that ' The grand jury can receive none but legal evidence.' (Sec. 256.) And that an indictment should not be found by a grand jury unless ' All the evidence before them, taken together, is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury.' (Sec. 258.) It is manifest, therefore, that if the only testimony before the grand jury is the testimony of accomplices, it cannot be said to be sufficient, if unexplained or uncontradicted, to warrant a conviction by the trial jury."

The rule as to corroboration of the testimony of an accomplice is subject to an important exception which has bearing upon the question to be decided at this time.    The exception is stated in the syllabus of the case of People v. O'Farrell (175 N. Y. 323, 17 N. Y. Crim. 407), as follows: " The fact that

upon the trial of an indictment * * * two accomplices testified in regard to the defendant's guilt instead of one is not a corroboration within the meaning of the statute, and in such a case it requires the same amount of other evidence to connect the defendant with the crime as if but one accomplice testified, in order to establish his guilt."

In this case the Court of Appeals unanimously reversed the Appellate Division and said (at p. 327) : " This brings us to the consideration of the second question, whether the fact that two accomplices testified in regard to the crime, instead of one, removed the case from the effect of section 399. We think it did not. The obvious purpose of that statute was not to secure the evidence of more than one accomplice, but related to the quality of the evidence rather than the quantity, and was to forbid the conviction of any person upon the evidence of an accomplice or accomplices, unless corroborated by other evidence. In the language of Judge Foster in State v. Williamson (42 Conn. 261, 265) : ' Merely adding to the number of broken reeds gives no increase of strength. The confirmation required to give the testimony of an accomplice the necessary weight should come from an unimpeached source, not from partners in guilt.' Such are the views of the text writers who discuss this subject. Greenleaf, in his work on Evidence (vol. 1, § 381), says: ' If two or more accomplices are produced as witnesses, they are not deemed to corroborate each other; but the same rule is applied, and the same confirmation is required, as if there were but one.' The same doctrine is stated in substantially the same language in 1 Taylor on Evidence (sec. 970). In 1 Phillips on Evidence (Cowen & Hill's Notes, 4th ed., p. 113) it is said: ' The practice of requiring confirmation, when the case for the prosecution is supported by an accomplice, applies equally when two or more accomplices are brought forward against a prisoner.' In Underhill on Criminal Evidence (sec. 75) it is said: ' Corroboration by independent evidence is not dispensed with where several accomplices testify

against the accused. The accomplices are not deemed to corroborate each other.' "

Bearing in mind the principles which have been adverted to we are now in a position to discuss the grounds upon which the present application rests.

The contention of the defendant upon this motion is that since the trial of this case the defendant has discovered certain facts in regard to the witness Giovanni Mancini which, had they been known at the time of the trial and had the court and jury been put in possession of them, would have changed the result of the trial. Mancini was permitted to testify and did testify in support of the story told by Raffaele Daniello regarding the conspiracy in which it was claimed the defendant was involved. As will be shown, the testimony of Mancini was submitted to the jury for the purpose of corroborating Daniello and under instructions to the jury to determine upon the evidence in the case whether Mancini was or was not an accomplice. The affidavit submitted by the defendant states that upon the same day when this defendant was indicted in Kings county for the killing of Ubriaco and Morello, Mancini was indicted in New York county for the killing of Ferrazano. The indictment against Mancini was what is known as a secret indictment, and defendant's counsel in the moving affidavit states that it is his belief that it was not known to the trial court in the present case at the time of the trial that Mancini had been indicted, but that knowledge of the fact of such indictment having been found against him was known at the time of defendant's trial only to the district attorneys of Kings and New York counties. The defendant further contends that the assistant district attorney who tried the case against this defendant endeavored to withhold from the court and the jury knowledge that the witness Mancini was then a codefendant under indictment in connection with one of the murders which were the result of the conspiracy. In support of his contention he refers to the record of the cross-examination of Mancini, as

follows: " Q. And you are under indictment now, aren't you, for murder? Mr. Warbasse: That is objected to unless the same rule, by consent, applies to the defendant and all of the defendant's witnesses. The Court: Let him say whether he is under indictment for murder arising out of this same occurrence. Mr. Warbasse: I have no objection to that. The interpreter: Question, please? By Mr. Reilly: Q. You are under indictment for murder; for one of the murders that Daniello told the police about? The Court: That is excluded. That is not what I said I would allow. By Mr. Reilly: Q. Well, whom are you under indictment for the murder of? Mr. Warbasse: That is objected to as assuming he is. The Court: That is excluded. By Mr. Reilly: Q. Are you indicted for the killing of Ubriaco? A. I never killed anybody. Q. I say, are you indicted? A. Never."

On redirect examination Mr. Warbasse, the trial assistant district attorney, asked these questions: " Q. Last November, when you were sent to police headquarters, you were sent there under arrest as a witness, were you? A. I was arrested as a witness, yes. Q. And you are still held as a witness? A. Yes, as a witness. I am under $25,000 bail. Q. You testified before the grand jury, didn't you, in this case? A. Yes."

On re-cross-examination by Mr. Reilly the following took place: "Q. You say you are here as a witness now? A. Yes. Q. Haven't you been indicted in New York, and haven't you pleaded not guilty to the indictment of murder in the first degree? Mr. Warbasse: Objected to. Your Honor has already excluded it as improper. The Court: Well, I will allow him to answer. The Witness: I have not killed anybody yet. What do I know? By Mr. Reilly: Q. Have you pleaded to an indictment in New York? A. I was only before the grand jury. I was not before the court. Q. Have you been over to New York since you have been arrested? A. Yes, after they called me here, they sent me to New York."

The rule has already been referred to that one accomplice

cannot be used to corroborate another accomplice. Mancini was not only an accomplice in fact, if the testimony of Daniello is to be believed, but he was an accomplice in law, and his testimony was wholly ineffective in corroboration of the testimony given by Daniello.

After the trial and conviction of the defendant, and on the 13th of December, 1918, Mancini pleaded guilty to manslaughter in the second degree, in that he, with others, conspired to kill Ferrazano, and upon the recommendation of the district attorney of Kings county he received the same terms and benefit as Daniello had received, namely, a suspended sentence and probation.

The question is thus squarely presented whether, if the jury by whom the defendant was convicted had been aware of the relation of Mancini to the conspiracy, and the fact that at the time when he testified he was an accomplice and under indictment for the commission of one of these murders, would the jury have regarded his testimony in the same light as they presumably regarded it in reaching the conclusion which they did?

It is apparent from what will now be stated that the question of the corroboration of Daniello's testimony by that of Mancini was a factor of extreme importance in the minds of the jury. I am unable to give any stronger proof in support of this statement than is found in a perusal of the record itself. In the summation of the case by the assistant district attorney great weight was placed upon the fact that Mancini's testimony corroborated that of Daniello, and that Daniello's testimony corroborated that of Mancini upon the fundamental point in the case, namely, that the defendant was initiated into the band of criminals forming the Camorra, which was organized for the purpose of dealing in murder and stealing. At the conclusion of the testimony the following discussion took place between court and counsel: " The Court: Now, as to those two witnesses that you spoke of, Daniello first, on what theory do

you claim, Mr. District Attorney, that the question of whether he is an accomplice should be submitted to the jury as a question of fact?   Mr. Warbasse: First, because the complicity of any witness is always a question of fact.   *   *   *   The Court: Now, as to Mancini, will you tell me, Mr. Reilly, please, what evidence in the case you think justifies leaving to the jury, as a question of fact, whether Mancini is an accomplice?   Mr. Reilly: The evidence is that six men were named in the general scheme to get rid of the Morellos.   Six men were named in Philadelphia.   The Court: Yes.   Mr. Reilly: The evidence is that certain persons got rid of Ubriaco and Morello as a part of the scheme.   Then Ralph Daniello and John Mancini are sent from Brooklyn over to New York to kill Ferrazano.   Ferrazano is killed by two other men, while these two are waiting outside, and had Ferrazano come out at the door at which they were waiting they would have killed him themselves.   The Court: I thought there might be a possibility of inferring that Mancini was sent over there to kill him, but there is no evidence at all that Mancini was sent over there to kill him.   Mr. Warbasse: Let me call your Honor's attention, in that connection, to Daniello's testimony that Mancini knew nothing about the mission for which they went over.   Mr. Reilly: My recollection is, and the copy of the evidence that I have shows, that Mancini waited outside.   The Court: With Daniello?   Mr. Reilly: Yes, and that as soon as it was over they both came back to Brooklyn, and both went to Alessandrio's house to tell him it was done, and rang the door bell, which was not answered, and then, when there was no response—   The Court: I hardly think there is any evidence there from which the jury could possibly infer it, though perhaps I could leave it to them as a question of fact.   There is no direct evidence—none that I recall, at any rate.   Mr. Reilly: No, no evidence but that which I have stated.   If from that evidence they make up their minds that he was an accomplice, and arrive at the conclusion that he was an accomplice, then he is just as much an accom-

plice in law as Daniello.    The Court:  I think that I will probably explain to the jury what an accomplice is and say they can decide for themselves whether there is any proof in the case which justifies finding that Mancini was an accomplice.    Mr. Warbasse:  It seems to me that before your Honor could submit the question of the complicity of Mancini to the jury there would have to be some evidence in the case upon which a conviction against Mancini could be based.  The Court: That is true, but there are certain circumstances that are suggestive, at least, about Mancini going over there.    What was he there for?    Mr. Reilly:  They were all members of the one gang.    They knew in Navy street what they were going to do to the Morellos.    He was present that day, and he was present at the banquet when the toast was drunk.    'Here is to the health of the Neapolitans and the destruction of the Sicilians.' Mr. Warbasse:  You will recall, for instance, that not only Paolo Panzoni said, but Daniello said, that the conference was almost over at the restaurant when Mancini came in.    Mr. Reilly: He was unfortunate in being late, but he was down at the banquet that night and knew what they had done.    The Court: He claims that they were down at his own place when some of them were sworn into the Camorra, and they may have made him a member of the Camorra, for all I know.    That sounded about like what they were doing."

The court charged the jury regarding Mancini as follows: " The People claim that among other witnesses they have corroborated what Daniello said, and have shown the defendant's connection with this crime by the witness Mancini.    Mancini, you may remember, was the man who testified that he was a partner of Daniello some years ago in the restaurant business, and claims that he was present at one or two of the conferences at Coney Island and elsewhere, and also in the restaurant on Myrtle avenue on the day of the alleged murder.    Mancini claims that he was in those places; that he heard some of the talk as to the planning of this shooting in Navy street; and

that he went over to New York with Daniello at the time of the killing of Ferrazano, who is said to have been the third member of the Morello gang to be killed pursuant to this conspiracy. Although there is no claim that Mancini had a hand in the actual killing of Ferrazano, he appears to have been outside of or near the restaurant with Daniello at the time that the two other men went into the restaurant and did the actual killing. The claim of the defense is that Mancini was also an accomplice; that he was a party to the same undertaking, and was just as guilty as Daniello. An accomplice, very briefly, is anyone who has a hand in the commission of a crime, where the proof shows that he himself could be indicted for the crime. In other words, the proof has to show, before a jury can find that a witness is an accomplice, that the alleged accomplice could himself have been legally and properly charged with the commission of the offense in question. I have said, as to Daniello, that there is no question about his being an accomplice, if you believe what he says, because he says he is, and that settles that point. But as to Mancini, he does not say that he was a member of the gang, or had any hand at all in this killing. That he knew the others; that he went with them more or less and met them here and there is not denied, but whether or not he was an accomplice in the eyes of the law I am going to leave to you as a question of fact. It will be determined, as I have already indicated to you, by your decision as to whether or not you find on the proof in this case that he, Mancini, could himself have been properly and legally prosecuted for this particular crime. If he could have been, he is an accomplice; if he could not have been, he is not an accomplice. If he is not an accomplice, and you believe what he says, then you might—I do not say you would—find in his testimony corroboration of what Daniello said, at least as to some part, tending to connect the defendant with the commission of this crime."

The jury retired at 6:31 o'clock p. m. They returned into

court at 2:23 o'clock on the following morning, and the follow-ing took place: "The Court: Mr. Foreman, you say you want a part of the charge read? The Foreman of the Jury: The part of the charge in which you state the law about John Mancini in this case. The Court: All right, the stenographer will read that to you. [The stenographer read as follows] : 'They have corroborated what Daniello said and have shown the defendant's connection with this crime by the witness Mancini. Mancini, you may remember, was the man who testified that he was a partner of Daniello some years ago in the restaurant business, and claims that he was present at one or two of the conferences at Coney Island and elsewhere, and also in the restaurant on Myrtle avenue on the day of the alleged murder. Mancini claims that he was in those places, that he heard some of the talk as to the planning of this shooting in Navy street, and that he went over to New York with Daniello at the time of the killing of Ferrazano, who is said to have been the third member of the Morello gang to be killed pursuant to this conspiracy. Although there is no claim that Mancini had a hand in the actual killing of Ferrazano, he appears to have been outside of or near the restaurant with Daniello at the time that two other men went into the restaurant and did the actual killing. The claim of the defense is that Mancini was also an accomplice; that he was a party to this same undertaking and was just as guilty as Daniello. An accomplice, very briefly, is anyone who has a hand in the commission of a crime, where the proof shows that he himself could be indicted for the crime. In other words, the proof has to show, before a jury can find that a witness is an accomplice, that the alleged accomplice could himself have been legally and properly charged with the commission of the offense in question. I have said, as to Daniello, that there is no question about his being an accomplice, if you believe what he says, because he says he is, and that settles that point. But as to Mancini, he does not say that he was a member of the gang or had any hand at all in this

killing; that he knew the others; that he went with them more
or less and met them here, and that is not denied; but whether
or not he was an accomplice in the eyes of the law I am going to
leave to you as a question of fact.    It will be determined, as I
have already indicated to you, by your decision as to whether
or not you find on the proof in this case that he (Mancini)
could himself have been properly and legally prosecuted for
this particular crime.    If he could have been, he is an accom-
plice; if he could not have been, he is not an accomplice.    If
he is not an accomplice, and you believe what he says, then you
might—I do not say you would—find in his testimony cor-
roboration of what Daniello said, at least as to some part, tend-
ing to connect the defendant with the commission of this crime.'
The Court: Gentlemen, if that is not all you want, please let
me know now.    I shall be here all night, and if there is any-
thing you want at any time, if you will let me know, you may
come in and have it.    [At 2:28 a. m. the jury again retired.
At 3:08 o'clock a. m. the jury again returned into court.]    The
Court: Gentlemen, after you retired, I had my attention
called to the fact that the stenographer when he began to read
to you began in the middle of a sentence; and in order that
there may be no possibility of any misapprehension about it I
have asked you to come back.    I think it is clear to you what
was meant, but he started off as though I had stated it as a fact
that there was a corroboration.    Of course, you know that I did
not state that as a fact.    I said that it is for you to say whether
there is.    I said that the prosecution claims that there was cor-
roboration in the opening part of the sentence which the stenog-
rapher omitted to read to you, and which just preceded the
point at which he began.    I think it was plain, anyhow, but in
the abundance of caution I asked you to come back that I
might say that to you.    In listening to the stenographer read
what I said about accomplices I am afraid that perhaps my
definition of accomplice might be misunderstood by laymen.
What I am going to say to you about it now is exactly the same

in legal meaning as what I did say to you.    I said that an accomplice is one who could properly and legally be indicted for the offense in question.    That is correct, because no one could properly and legally be indicted unless the proof was sufficient to convict him.    You might not know that, however, and I am just going to say that what that meant is that an accomplice is one who could be convicted of the offense charged, and that is equivalent to saying that he could be lawfully indicted, because you cannot find a lawful indictment unless there is sufficient proof to convict.    Not being lawyers, however, you might not know that.    I am not making any change at all in the legal effect of the charge, but am just explaining to you what perhaps I should have explained in the first instance. I think you will get that clearly.    An accomplice is one who himself, on the proof in the case, would be guilty of the offense charged.    If he would not be guilty on the proof in the case of the offense charged he is not an accomplice.    I hope that is plain."

In view of this recital of the proceedings upon the trial, and in view of the facts which have developed with regard to Mancini's indictment and subsequent conviction, is it possible to resist the conclusion that if the facts regarding his indictment for complicity in the crimes which were the outcome of the conspiracy had been known to the jury the result of their long deliberations would have been different?    Whether knowledge of the fact of Mancini's indictment for murder was deliberately kept from the trial court and the jury by the assistant district attorney who tried the case, as is claimed by the defendant, or whether it was then unknown to the prosecuting officer, is immaterial.    I do not decide that question.    It is sufficient that the jury did not know the fact.    Clearly the trial justice himself was not aware of it.    If he had been he most certainly would not have charged the jury as he did regarding Mancini.    Moreover, there is nothing in the elaborate briefs which were submitted to the Court of Appeals which disclosed the fact to that

court.   As a matter of fact, the fourth point in the brief of the
learned district attorney before that court (p. 121) states as a
proposition: " It was not error for the court not to charge as a
matter of law that the witness Mancini was an accomplice."
The case was presented both before the trial court and upon
the appeal with Mancini occupying merely the position of a
material witness held under bail and not as an accomplice.
He was produced before the jury as apparently, and on this
motion is asserted to be, one who was merely a spectator or
" innocent bystander " to the criminal conspiracy, not as a
principal then under secret indictment as a co-conspirator.   By
some arrangement he was not required to plead to the indict-
ment until June 25, 1918, after the trial of this defendant, and
then he pleaded not guilty, which plea on December 13, 1918,
he changed to a plea of manslaughter in the second degree, and
thereupon his sentence was suspended.   In reality his position
was similar to that of the three witnesses in the first Becker
trial, who were concededly implicated with him and obtained
immunity by giving evidence tending to convict the defendant
in that case.   That conviction was reversed (People v. Becker,
210 N. Y. 274) largely because the court held that it was ques-
tionable whether there was any testimony corroborating the
testimony of these witnesses as to the guilt of the defendant.
Upon the appeal from the second trial the court held that there
was evidence in the case, other than that of the accomplices,
tending to connect the defendant with the commission of the
crime.

In reviewing the second trial the Court of Appeals said:
" The jury were properly warned that in weighing the words of
Rose, Vallon and Webber, the fact that these witnesses had
been granted immunity provided they did not actually fire
the fatal shots, should be taken into account, and the further
fact that they had an interest to shield themselves in the testi-
mony they should give." (215 N. Y. 126, 140, 33 N. Y.
Crim. 193.)   In the case at bar no such warning was given with

regard to Mancini, and in that respect the Becker jury was in a better position to pass upon the credibility of the witnesses referred to than the jury in the present case if, as seems not unlikely, an arrangement for immunity had been made with Mancini.

The assistant district attorney who opposed the present application contends that even without regard to the testimony of Mancini there was sufficient corroboration of the story told by Daniello to support the conviction of the defendant, but he does not specify how otherwise it was corroborated. I regret that I cannot concur in the contention. Such corroboration as there was came from the mouths of other members of the conspiracy who were equally steeped in the crimes committed. If, then, we regard Mancini as an accomplice in the crime, his testimony is valueless as corroboration of the testimony given by Daniello, also an accomplice. I am accordingly forced to the conclusion that the jury would in all probability not have found a verdict of guilty against the defendant if the real facts which are now known concerning Mancini's indictment as a principal in one of the murders had been known to the trial court and explained, in its legal effect, to the jury. Indeed, I am not at all sure that if the facts concerning his indictment and the suspension of his sentence had been disclosed to the Court of Appeals a different result would not have been reached in that court.

There remain for consideration certain matters involved in the decision of this application which are discussed in the brief submitted in opposition by the district attorney. He cites the case of People v. Priori (164 N. Y. 459), in which the Court of Appeals declared the rule applicable to such a motion as this as follows: " Newly discovered evidence in order to be sufficient must fulfill all the following requirements: (1) It must be such as will probably change the result if a new trial is granted; (2) It must have been discovered since the trial; (3) It must be such as could not have been discovered before the trial by

the exercise of due diligence; (4) It must be material to the issue; (5) It must not be cumulative to the former issue; and (6) it must not be merely impeaching or contradicting the former evidence." (P. 472.)

As to the first of these conditions I assume that the language employed by the court is equivalent to the language used in section 465 of the Code of Criminal Procedure, viz.: "Where it is made to appear, by affidavit, that upon another trial the defendant can produce evidence such as, if before received, would probably have changed the verdict." This phase of the case has already been considered and requires no further comment. As to the second and third conditions, the moving affidavit of defendant's counsel states: "At the close of the trial of this defendant, the court, not being aware that Mancini had been indicted in this conspiracy and the counsel for the defendant and defendant not having been able to obtain such information, the following discussion took place between the trial court, the trial district attorney and the counsel for the defendant." And in his memorandum, submitted to the court, he says that he had stated under oath that he did not know the fact that Mancini had been indicted in this conspiracy. The district attorney does not meet these statements with anything more substantial than surmises that defendant and his counsel must have known of Mancini's indictment for the murder of Ferrazano.

The question of Mancini's participation in the conspiracy as a principal as affecting the right of the prosecution to use him as a material and disinterested witness to corroborate Daniello was a close one. Good faith, not alone to the court presiding at the trial, but also to the jury and to the defendant on trial for his life, demanded that the district attorney reveal the fact to them, if he was aware of it, that Mancini was under indictment as a principal and not merely held as a material witness under bail. Moreover, if it were the fact, as the defendant now claims, that an agreement then existed between

the district attorney's office in New York and Brooklyn to permit Daniello and Mancini to plead to crimes of a lesser degree and to obtain suspended sentences in consideration of giving evidence against this defendant upon his trial, then that scrupulous good faith which is expected of a prosecuting officer required a disclosure of the fact of the indictment of Mancini so that court and jury might judge the weight to be given to his evidence in the light of such agreement.   On the contrary, however, it appears, as has already been stated, that Mancini had been charged with the crime of murder of one of the three members of the Morello gang, whose death was one of the objects of the conspiracy.   This had been done by a secret indictment on the same day on which the defendant herein had been indicted for the murder of another one of the three victims of the conspiracy.   The statement to this effect in the moving affidavit is not contradicted by the answering affidavits, and, as to its having been secret, it is corroborated by the affidavit of Higgins, a county detective, who avers that the deputy clerk of the Court of General Sessions of New York City informed him that the original indictment was secret by order of the court and that the names of the other defendants could not be disclosed to him because some of them had not been apprehended. 'Under all these circumstances I am of the opinion that the defendant has met the conditions stated as to discovery and due diligence as to the indictment of Mancini.

As to the fourth, fifth and sixth conditions above stated: The evidence in question is certainly material (see 5 Chamberlayne Ev., § 3754), and it was not cumulative in its nature, nor does it merely impeach or contradict the former evidence.

To my mind the fact that no affidavit by the learned district attorney or his trial assistant is submitted in contradiction of the statement that the fact of Mancini's indictment was known to the district attorneys of Kings and New York counties at the time of defendant's trial is significant.   Their silence upon this point seems quite remarkable in view of the serious charge

made in the moving affidavit. In my opinion the answering affidavits are singularly unsatisfactory and incomplete, and were it not for that fact, I should have less difficulty in reaching a conclusion more satisfactory to my own mind and conscience and one which would not involve the expense and labor of a new trial of this defendant.

In the light of all that has been stated in this memorandum, which I fear only inadequately covers the matters involved in this application, I have concluded, in the exercise of the judicial discretion which the law reposes in the court, to grant a new trial to this defendant.

Motion granted.